**RICHARD JOHNSON, Plaintiff**

**v.**

**ROBERT B. COULTER dba SOUTH PACIFIC ENGINE & REPAIR, and SOUTH PACIFIC ENGINE & REPAIR INC. a corporation and SAMOA NAPA INC. a corporation, Defendants**

High Court of American Samoa
Trial Division

CA No. 22-91

September 20, 1995

Before KRUSE, Chief Justice, TAUANU`U, Chief Associate Judge, and BETHAM, Associate Judge.

Counsel:     For Plaintiff, Marshall Ashley
             For Defendants, Roy J.D. Hall, Jr. and Brian M. Thompson

Opinion and Order:

Plaintiff Richard Johnson seeks the dissolution of a partnership, which he claims was formed with defendant Robert B. Coulter, and the distribution of partnership assets. To this end, he further seeks the award of a constructive trust and an accounting of partnership assets. Coulter, on the other hand, denies the formation of any partnership with Johnson.

Upon joint motion of the parties, trial of the issues herein was bifurcated to consider, first, the issue of whether or not Johnson and Coulter had entered into a partnership. There is no written partnership agreement between Johnson and Coulter. Accordingly, the court is invited to look to circumstantial evidence offered by each party to back his oral claim of the presence or absence of a partnership.

The parties initially met when Johnson was employed as the accountant for South West Marine, the operator of the local dry dock facility, and Coulter was a salesman for Pacific Machinery Inc., a dealer in equipment and

218

machinery which was one of South West Marine's trade vendors. Johnson and Coulter got to know each other socially and subsequently became friends. Johnson later left South West Marine and temporarily departed the territory. Coulter went on to set up shop for himself, essentially assuming Pacific Machinery's business niche after the latter's withdrawal from the territory.

Coulter then began to receive various things in the mail for Johnson, who had apparently given Coulter's mail box as a forwarding address. Coulter stored Johnson's mail until Johnson returned to the territory in the early part of 1989 to participate in a joint venture involving the hauling and dumping of cannery sludge at sea. Subsequently, Johnson sold his interest in the sludge hauling business and extended his accounting expertise to Coulter, who had started South Pacific Engine & Repair ("SPEAR") as a sole proprietor. As SPEAR began to grow, acquiring a NAPA Auto Parts agency for the territory, Coulter found himself becoming overwhelmed with work, requiring him to put in long hours. He needed help. He sought Johnson's accounting expertise and Johnson agreed to help him out. At the outset, both parties recognized that SPEAR was not in a position to appropriately compensate Johnson, but this did not deter Johnson's desire to help out.

While the evidence does not suggest that Johnson had agreed to work for nothing, we find that there was no attempt by the parties to define their intentions at the outset. Johnson initially instituted various control systems, but he became increasingly involved with the retail side of the business, beyond accounting work. He loaned $5,000 to the business, which was later repaid. Subsequently, he made additional advances to the business, during certain "crisis" times when there was no money to lift various bank drafts for specific orders which became due and payable. These "crisis" times occurred on six occasions, between July 8, 1989, and January 2, 1990; Johnson, from his own pocket, paid SPEAR's suppliers a total of $66,029.41. He claims that these cash injections were in the way of capital contributions.

On the one hand, Johnson saw his relationship with Coulter as one of partnership. In support of his contention, Johnson testified that, around July 1989, he and Coulter had met concerning the business' capital needs and that as a result of that meeting, they agreed to put in capital of $65,000 each.

Johnson also offered the corroborating testimony of Douglas Harrington, a mutual friend of the parties, who testified about a conversation that he

had with Coulter one afternoon around October or November 1989. Harrington testified that he and Coulter were conversing through the fence at the Satala Power Plant, where he was working at the time, and that Coulter had mentioned that he and Johnson were going in together on a deal with SPEAR, and that Johnson was going to invest some money. He further recalled Coulter saying that it would be a "good marriage," given Johnson's accounting background, but that neither Coulter nor Johnson had said anything to him about the exact nature of Johnson's investment.

Coulter, on the other hand, flatly denies the formation of a partnership with Johnson. While acknowledging that Johnson had advanced funds to SPEAR, he claims that these were simply loans, not capital contributions. He testified that in other times of need, he had received loans from other friends as well. Coulter further testified that he had always run his business as a sole proprietor, that the business license was under his name alone, that he alone did the hiring and firing, that he alone established the business's credit rating with suppliers and the bank, that he alone signed on the bank loans, and that he alone had the final word on the placing of orders. In corroboration, Coulter tendered his tax returns, financial statements, certain correspondence with Bank of Hawaii, and the testimony of a former employee to the effect that Johnson was introduced as, and was always understood to be, merely the accountant and not a co-owner.

We find the evidence insufficient to establish a partnership between Johnson and Coulter. Harrington's testimony is at best equivocal on the issue of partnership. As a corroborative witness, Harrington is not particularly reassuring. His articulation is prone not only to inexactness but also a certain degree of embellishment. For instance, he testified that, at the time, he was a heavy equipment mechanic seeking to sublease space behind the Faganeanea premises from SPEAR. This, he considered, would also be a "good marriage." Additionally, he alluded to his being invited to participate on a SPEAR "board of directors," in what was then, however, a non-corporate business. Finally, we note an early affidavit Harrington had given in support of a Johnson motion to dismiss. Harrington stated in this affidavit that Johnson was a "co-owner" of SPEAR. He later attempted to retract that statement, not wanting to "perger" himself.

On the other hand, the documentary exhibits received into evidence lend some objective support to Coulter's claim that SPEAR was not only run as a sole proprietorship, but also held out as such to third parties, including the government and other creditors. For instance, the

promissory notes issued pursuant to a revolving line of credit from the Bank of Hawaii objectively demonstrate that Coulter alone was liable on the indebtedness evidenced by them. There was nothing to suggest that the Bank of Hawaii could hold Johnson jointly liable on those notes. The same may be said of SPEAR's other trade obligations.

The nature of the advances by Johnson is also unclear. The context in which they were made does not lend more credence to Johnson's position than Coulter's. Indeed, the advances arose in response to "crisis" situations, albeit recurring, which demanded the immediate payment for goods shipped on SPEAR's account, rather than as the product of a contemporaneous or preceding agreement of partnership. In our assessment of the evidence, the resultant figure of $65,000, claimed as partnership capital by Johnson, had more to do with the fortuitous value of the invoices for "crisis" shipments than any predefined partnership terms. Again, while we find no suggestion on the evidence that Johnson had simply donated these funds out of the goodness of his heart, we also find nothing in the evidence suggesting anything but ill-defined intentions at these particular times of "crisis."

The resulting situation had, in our view, simply arisen upon a mutual friendship premise, that one party will do good by the other, and vice versa. In this same vein, Johnson was permitted to live on the SPEAR shop premises rent-free, after Coulter had made rudimentary alterations to the premises for that purpose. That relationship between the parties was fine so long as the friendship was alive and well. When the relationship deteriorated, and the friendship began to sour, each party's interpretation of their business relationship had, in our view, more to do with hindsight than any concluded agreements.

While counsel for Johnson earnestly submits that no-one works for nothing nor advances great sums of money without a sensibly underlying explanation--e.g., a joint venture--it might equally be said that business people operating in a business relationship, as opposed to relationship based on friendship, do not in the normal course commit themselves to lay out time and money until they reduce their agreements to more objective foundation than the ill-defined agreement suggested by plaintiff.

Because we find the evidence insufficient to establish the formation of a partnership between the parties, and because plaintiff has the burden of proof, we conclude that judgment on this issue must be entered in favor of the defendant Coulter.